Morning. Thank God it's Friday. Three cases left. Counsel, we're familiar with your cases. We've read your briefs. The authorities cited in your briefs, at least portions of the record. You don't have a lot of time this morning, so feel free to get straight to the heart of your argument. We're probably going to have some questions. Be mindful of our time. Pay attention to the traffic lights. When the red light shines, please don't treat it as aspirational. It's time to wrap it up. If you're answering a question from the court, feel free to finish your answer. You won't lose rebuttal time if that's something that you have. We're going to start this morning with United States v. Wall. Mr. Winchester. Good morning. Good morning, Your Honor. Thank you, Mr. Chief Judge, Your Honors, and please please the court. My name is Kyle Winchester. It's a privilege to be here today. I will first address the problems with the second derogatory in the special verdict form submitted to the jury, and specifically why this court's intervening decision in United States v. Caldwell is distinguishable from the facts of our case. Ms. Dunn will then address why the district court erred in holding that Co-Defendant Mobley was confident to stand trial, and Mr. Hollingsworth will address why the evidence pertaining to Co-Defendant Mr. Grease was insufficient. Your Honor, the Caldwell decision that was rendered after our opening brief was filed, but prior to the filing of our reply brief, is distinguishable from our case involving the acts involving murder over broad instruction for three reasons. The first reason is whether this is analyzed as an affirmative challenge or a vagueness challenge to the charge, there are timely objections, and therefore the standard of review is de novo and not plain error. Secondly, the district court, unlike in Caldwell, gave an instruction that specifically linked the acts involving murder definition to the second interrogatory. It did that on document, and then the final reason is that the evidence of actual murder, as it applies to Mr. Wall, is not overwhelming in this case. So concerning timeliness of the objection, this objection was timely preserved in several ways. The first way was by, during the charge conference, Mr. Bryant made an objection asking the district court in the special verdict form to track the language of 1963A. The enhancement language for the racketeering conspiracy comes from 1963A, not 1961. Acts involving murder comes from the definition section in 1961. The district court acknowledged that request, overruled it. Mr. Bryant then maintained his objection, and then after the charge as given, Ms. Dunn, for Codefendant Mobley, renewed her objection to the verdict form. Let's just assume it was preserved. I mean, go back to Caldwell. Wasn't the instruction the same as the instruction in Caldwell, or was it different? No, Your Honor. The difference here is that in the charge, the court, and this is docket entry 2905 at page 25, lines 17 through 23, instructs the jury that you will have to make specific factual, answer specific factual questions involving the racketeering activity, specifically acts involving murder and drug trafficking. We know that that references specifically the second interrogatory because there were other forms of acts of racketeering that were listed in the indictment that were not included in that instruction. So when the court is saying acts of racketeering activity involving specific answers to factual questions, he's referring to the second interrogatory. So this is unlike Caldwell, where the court found that the only way the second interrogatory could have been interpreted was actual murder because the district court didn't define murder to mean anything other than malice murder under Georgia law. So just so I understand, the verdict form was the same, right? Correct. But you're saying the jury, the change in the jury instructions makes all the difference with the way the verdict form and the jury instructions work together? Yes, Your Honor, because this court reviews the verdict form as part of the instructions and we're reviewing the instructions as a whole on de novo review. So when we do that, the critical legal analysis in Caldwell that was fatal to the defendant's claim there was that the district judge defined murder only to mean actual murder under Georgia law. That is different from this case based on that specific link that the court makes in that paragraph. The verdict form referred to whether it involved murder, right, as opposed to acts involving murder. Yes, Your Honor. The jury instruction referred to it as acts involving murder, right. And in fact, the defendants proposed the verdict form. So there's really no objection to it. Any objection to the invited error? I see my time has expired. May I answer? You can, yes. The error is not invited, Your Honor, because . . . Well, is there an error with the verdict form? I mean, didn't you all propose that verdict form? No, Your Honor. This verdict form was imported from the verdict form that was used in the first trial. The defendants did propose two examples, but there was also a second oral objection made for the district judge in the event that he rejected those two proposed verdict forms to track the language of 1963A. So the district judge was tasked to resolve all three of those objections, and the third one is the one that preserves our issue here. I mean, here's what we said in Caldwell, and I just want you to address whether this is true here, too. We said, quote, the district court never said that the jury should read the phrase, involve murder, to mean involve acts involving murder. Is that the same thing here? No, Your Honor, and that, going back to the record citation I gave, page 25, document 2905, that is the jury instruction. My argument is that that jury instruction specifically links the expanded acts involving murder definition to the second interrogatory. So that's a legal distinction from the pivotal analysis in Caldwell. Do you have any questions? Ms. Stein. Thank you, Your Honor. The court forced Mr. Moley to trial when the uncontroverted evidence from the expert and counsel was that he was incompetent. The court also allowed the jury to hear that another jury had found co-conspirators guilty, which was highly prejudicial and properly lowered the government's burden of proof. Here, the government has conceded error, and that error was compounded by the court's intentional reference, referral to Mobley as a co-conspirator and the continued Hawkins errors. Finally, there was no evidence that Mr. Mobley committed or knew the acts based on murder would be committed by the gang. He had not yet joined the gang or was in prison during the time periods that the murders occurred, and the same goes for the drug enhancement. Starting with the competency issue... I mean, didn't he just decide not to participate with the government's expert so they couldn't do an expert analysis of him because he wouldn't participate in it? So, 31 years practicing law in the federal system, what I will tell Your Honor is if a defendant decides not to work with the government's expert, there is a way that BOP deals with that and the way the system deals with it. They send them off to Buttner or to Springfield where they are watched for two months. That happens all the time. Many times those people are found incompetent. The fact that somebody doesn't actually cooperate with the government's expert or even defense counsel's expert actually goes to the fact that they're not competent, goes to the fact that they possibly have deep-seated issues, and we know that Mr. Mobley did, right? We know that from a very, very long time, there is documented proof, evidence that the court credited in finding that he was schizophrenic. Right. Yeah, I guess here though, I mean, I don't know what BOP usually does to assess these people, but I mean, you have calls recording him talking about the case. The district judge has had colloquies with him in the courtroom. I mean, you'd have to show more than just that he's had schizophrenia, right, to raise enough of an issue for him to be sent for a two-month evaluation. I mean... Yes, sir. Yeah, okay, so what is it? Well, what we showed through our expert who did evaluate him... Right, because he participated with his own expert, right? So, I mean, it's not someone who's just incapable of being evaluated. He participated with the first expert we sent in and not the second expert we sent in. So, there clearly was something going on. During that time, that expert came in and said that he could not participate with counsel because he had truly held fears that counsel was trying to hurt him or kill him. We have documented letters which we showed the court that Mr. Mobley believed counsel was trying to hurt him or kill him, and we had two very experienced criminal defense lawyers together over 50 years in practicing criminal law that told the judge, I've known this man since 2013, and his behavior has changed. I am watching the paranoia change. I am watching it grow. Paranoia is one of those things that waxes and wanes, which both experts testified about. This is a case where what the judge had was one expert who said he was not competent, two defense counsel who said he was not competent, and nobody else who said he was competent. There were notations from records. The government's expert testified, did it not? The government's expert testified that he was malingering and was being treated with medication? No, sir. He testified that he could not make any kind of diagnosis of Mr. Mobley, but that there were records from years before that suggested that malingering needed to be ruled out and that he was asking for medication. He did not make an evaluation to that and could not and agreed that that would be ethically impermissible. Was he not being treated with medication? Yes, sir. He was being treated with medication, which I think is a really important point because one of the things our doctor, Julie Rand, told the court and I told the court repeatedly was that he needed his medication increased. We even contacted BOP, the Atlanta Penitentiary, where he was to get his medication increased and they wouldn't do it before trial. Within a week after trial, his medication, his antipsychotic medication was increased and then after the trial was over, he was sent off to CTECH. At CTECH, they doubled his Zyprexa olanzapine, which is a very serious antipsychotic medication. If I can finish answering this. Okay. I have another question for you anyway. The records that I gave to the court at Mr. Mobley's sentencing show that the difference between before his olanzapine was doubled, where his affect was flat, his thought processes were derailment, loose associations, his thought content was delusional, he was having hallucinations. Nine days later, after he had been on 30 milligrams of olanzapine, the doctors are saying that his affect is appropriate, his mood is contentment, his thought process are goal-directed. So the court actually had evidence that did in fact show that having doubled his olanzapine totally changed the landscape of his mental illness. In addition to counsel telling the court how different Mr. Mobley was, how he was not only cooperating, but was giving us information that he had never been able to give us before, so that we could run a very strong mitigation. I'm sorry. Yeah, just one question about this issue. So one of the things the district court relied on was your client's just in-court activity. Specifically, I think the district court said that there was a colloquy that he had with them when he had filed a motion to represent himself. Could you just address that? Because one of the things that's difficult for us on these competency issues is that oftentimes district court judges says, look, I've interfaced with a person face-to-face and we can't assess that really. So what do you say about that? Yes, sir. Thank you for bringing that up. I meant to address that. Mr. Mobley had moved several times as his paranoia started increasing to have substitute counsel. He did not ask to represent himself. The court said no, and instead decided to have a heretic in ring with Mr. Mobley. That was in February of 2019. February 2019 is months and months and months prior to when we started the trial in September, and several months prior to my doctor first interviewing Mr. Mobley and saying he was incompetent. So both doctors testified this type of mental illness, incompetency, waxes and wanes, and things like stress and inappropriate medication are problems. Dr. Rand specifically said, this is why you have somebody who should be looking at medication. And what we know now that perhaps we didn't know then is that the doctors at USP Atlanta were not giving the best standard of care. Department of Justice has investigated them, in fact, closed down parts of Atlanta and have reopened it up as a low in part because of the lack of medical appropriate medical treatment. So we know that now. I wish I had the evidence to present way back when, but we know it now. Okay. Any questions? No. Thank you. Thank you. You've saved two minutes. Mr. Hollingsworth. Oops.  It's okay. Good morning, Your Honor. May it please the Court. William Hollingsworth for Defendant Lawrence Grice. As you're well aware, the issue in the case is whether the counts of 1 and 24 of the indictment were proved beyond a reasonable doubt and whether or not the Article 29 motion that was made, the conclusion of the State's case, should have been granted. As I distill the case law in 18 U.S.C. 1962d, it looks like all that must be shown by the government is that the defendant agreed to commit the substance of racketeering offense through agreeing to participate in two or more racketeering acts, that the defendant knew the general status of the conspiracy and that the defendant knew the conspiracy extended beyond his individual role. It looks to me like the argument that I have made since that date was that the evidence in this case was insufficient, and it's insufficient in the particular point in Count 1, the 20 kilogram drug case, particularly I'd like to address that one as first, the deficiencies in the evidence as to that count. There were numerous attempts by the government to prove that my client orchestrated and carried out a 20 kilogram drug deal. There's so many counts. Is this the one about the packaging cocaine shipment? Is this the drug count you're talking about? Yes, Your Honor. Okay. Wasn't there evidence that Grice participated in the packaging of the shipment? No. Okay. No. Okay. I'll argue that there was a complete absence of that. Just a quick rundown. What happened was a drug deal was set up in a black Sprinter van. It was sent from the Houston area in Texas down, I believe it was I-10 or I-20, and it was stopped for traffic violation in Louisiana by either a Sergeant Benoit or a John Silette. They were the Louisiana State police that came and testified at the trial. A person named Octavia Fields was found to be in control of basically 18 packages consisting of about 46 pounds, I think, of cocaine. Now that cocaine was tested by a U.S. chemist, I think out of Miami, and that chemist came to court and said, I tested five of the 18 bags and I cannot say that there's over five kilograms of actual cocaine. I cross-examined that witness and she testified to that on cross-examination, and yet he was convicted of possessing over five kilograms of cocaine. That's a point of contention there. And then through Agent Barty, earlier the FBI came and testified. Chris Menard came and testified from the Houston FBI about my client, an Atlanta Police Department officer named Investigator Murdoch. Matthew Carman, an FBI analyst, came and testified about the cell phones. So there's no connection in the evidence of this case of my client, credible evidence, to that transport of that other than one photograph. Now, wait a minute. There were witnesses who testified that your client was a gangster disciple leader in Houston, right? There was, Your Honor, in my recollection of the case and on my review of the record, I never saw anybody testify other than an FBI agent imitated the Buddy Hurley that he was a member of a gang. There's no evidence of it except for a snippet of a video that was played in the case, a two-minute video where he talked to a man named Anthony McIntyre. I thought the jury also heard evidence that he personally participated in drug trafficking recruiting and packaged the Louisiana cocaine shipment, which was over five kilos, and that the cell phone records that you referenced a moment ago established that he was in a car chase following the Louisiana shipment and that he made 38 phone calls after the Louisiana traffic stopped from nearby the stop location. So did I, Your Honor. The cell phone in this case belonged to a person named Linda Grice. Matthew Carman, the FBI analyst who handled that, all he did was go and pull phone records on a phone that was linked to Octavia Fields, okay? And he looked up the number. He never even got the bills to the phone, but he said this number belongs to a person named Linda Grice out of the Houston area, okay? And then he did a cellular analysis based on where the numbers might have hit towers in Louisiana. Cell location data. But there was never a connection. That phone, the alleged number, ended in a 2301 that came into Octavia Fields' phone. There was never a link of that phone to my client, Lawrence Grice. Well, let's hear from the government. Ms. Rowe. Thank you, Your Honor. May it please the Court, Sangita Rowe on behalf of the United States. This was a five-week trial. Over 60 witnesses testified. About 12 of them were GD gang members or co-conspirators. There was a mountain of physical evidence, including videos of attempted murder, murder by Mr. Mobley, murder by Verrett Walt. The recorded calls, dozens of them discussing the crimes. A mountain of evidence seized from searches of the co-conspirators' homes of drugs and firearms. Well, why don't we go through the issues we've been talking about one at a time this morning, right? Let's talk about the alleged instructional error. So on the special verdict form, this case is decided by Caldwell. The instructions are the same. The relevant instructions are the same. I would point this Court to the Caldwell decision at pages 1182, where this Court said the district judge instructed the jury that acts involving murder for the purposes of finding the two racketeering activities needed for conviction extended to Georgia law conspiracy to commit murder and attempted murder. The instructions, the relevant instructions are the same. The verdict form is the same. It said involved murder. It didn't say acts involving murder. The defendant's objections were the same or even worse. So they have the exact same instruction that they proposed in Exhibit 1 to their proposed instructions that asked for that acts involving murder language. They had another instruction, Exhibit B, that was even more specific and specifically asked the jury to allow them to find attempted murder or conspiracy to commit murder. It is on all fours with Caldwell. This is the one difference. At the jury charge conference, there was an objection by Mobley's defense counsel about the based on language. So at the jury charge instruction, they asked for involved murder to be changed to based on murder. But that did not preserve all the rest of the objections. They never said that that difference in language they were requesting implicated this issue about acts involving murder and they never disavowed any of their prior requests. That did not alert the district court to the problem that they're raising now. And so Caldwell, again, is on all fours and there's no prejudicial error with special verdict instructions. Okay. What about the competency issue? On competency, the district court did not clearly err. This is a high bar. The district court carefully considered the evidence. There was a two-day evidentiary hearing. It considered its entire observation of Mobley, which included that February 2019 Ferretti hearing. It included the rest of the pretrial conferences. And critically, at sentencing, the district court said, I continue to observe Mobley throughout trial to make sure that my competency finding was secure. And he saw him, Mobley, the claim was that Mobley was scared of his defense counsel. He saw Mobley not acting afraid, not acting like defense counsel was going to kill him. We know from reported jail calls that he was still interacting with his attorneys. He asked one of his family that there's no expert testimony that he was competent, but that there was expert testimony that he was not competent, that the district court had reason to find could be discredited based on the judge's own personal observation, the recorded jail calls, et cetera. That's absolutely right, Your Honor. And the district court had a finding of malingering. The government expert did not because the government expert wasn't allowed to talk to Mobley. Mobley was supposed to talk to two defense experts. He declined to talk to the other expert and he declined the objective test on malingering. The district court found malingering at the September 4th, 2019 hearing. This is what he says. I think he's deliberately trying to get out of trial. And that's the bottom line, I think, of what's going on here. The sentence before that is basically, I think he wants to get sent a buttoner to delay the trial. So that was part of the analysis. For malingering, defendant had a motive. He had expressed that he didn't want to be in a multi-defendant trial. He had a past history of malingering. There's a 2009 finding of malingering and there's a 2014 question of whether he was malingering. He refused to meet with the government expert, as we talked about. He refused those objective tests. There's the comment to the guard on the day the government expert tried to talk to him, where he says, I don't want to talk to that guy to be made competent. And then there's the recorded jail calls. That record does not show clear error. On Bryce, the government is mostly going to stand on its brief, but I would just say that as to the packaging drugs himself question that Judge Brasher asked, that's on government brief 13. Tell me this, were there witnesses who testified that he was a leader in the Houston area? Absolutely. Who were the witnesses? There's his own words. His reporting to the confidential informant talks about his experience and how he was leading the count and names all the important people like Shake and Clone. And Dontrell Gilmore, who is the G.D. governor of North Carolina, also confirmed his G.D. leadership role. Dontrell Gilmore went to Colorado, was trying to arrange more drug trafficking with Bryce. So that evidence is overwhelming. So what is, the government's brief says that there was evidence that he was involved in the packaging of this shipment, and I guess I haven't looked at your specific record sites for that, but what are you citing when you're saying that? Right, so the sites are to the transcript. So I don't remember the words anymore. Well, I'm just saying what witness? I mean, who said that? What was the evidence? It's actually, I think it's him. It's the transcript of his, he met with a confidential informant, and he was being reported. So this is when he talked about his own experiences with the G.D., with the Houston count, and his relationship to that. So he talked about packaging. There's so many more details, Your Honor. He also knew so many details about the... So if I'm looking at record 2826, at 189, and then 193 to 94, 204 to 205, 212 to 214, are those all these recordings you're talking about with the... Yes, Your Honor. So they're on government briefs. Those record citations are what he's saying. Yes, if you look at, again, I think there's a number of sites on government brief 12 to 13, which is in the facts section, and then again in the sufficiency section. And you can hear and read his own words, the transcripts. Other record citations were in the 2957 category. So I believe that that's Don Taylor Gilmore, the G.D. governor of North Carolina. And there are multiple pages with him. Yes, there's also the evidence about the cell phones. So some of these sites could be about the cell phones. Some of these sites could be about the seizure of the drugs themselves, because there were three adults and a baby on board. And that's what the defendant mentioned also. He mentioned the seizure with the baby. So it's these kinds of specific facts that show his knowledge. Well, so counsel for the defense for Grice says that the cell phone was registered to a woman who had the same last name. There was nothing to link that up to him. What do you say about that? Well, I think that just the fact that people use cell phones are actually listed in someone else's name, but you have all the hits of following the... The path he was following. He was in a chase car. And we know it was a chase car, especially when you put it together with all the other inferences, because of the 38 phone calls that happened once the seizure happened. So yes, it was listed in someone else's name. Does nothing to take away from the proof. Unless the court has any other questions, we will rest on our brief. Okay. Thank you, Ms. Rao. Ms. Dunn, you've saved a couple minutes. Thank you. So the special verdict form that we proposed, we also proposed a lot of language about what was required to prove the RICO conspiracy and asked that those same things were included in the enhancement, and the judge did not... Is that a different argument than what I heard in opening? No, sir. This is what my co-counsel... Well, I understood him to be arguing about the acts involving murder versus the involved murder. How is this related to that? I also opened on that, Your Honor, and specifically stated I was going to argue that I didn't get to... But you never did. Okay. But I said I was going to, so I mentioned it, so I think I'm allowed to, but if you don't want me to, I won't. Well, I'm just trying to figure out how these things link up together, and I didn't remember anything about that before. This sounds entirely new to me. I know you said you were going to reach it. I just don't remember you reaching it. That's right. I don't have a lot of time. I get it. I understand. But perhaps what I can say is that we specifically put the court on notice about this issue. Mr. Bryant asked that it be based on murder, specifically said that's the only way the statutory maximum could be increased to life. That is from... I don't have the record, but it's page 118 and 119, and I can get the court... Do you want to say anything about competency? I do, but I also need to point out that the government knew about this issue because they were saying that the enhancement could be based on threats involving murder, not just based on murder, and that's page 121 of the charge conference transcript. We knew what we were talking about, and everybody in that courtroom knew that the judge believed that it would be okay for it to be a threat or conspiracy or attempt. With respect to the competency, I think it's really important to think about what a trial looks like when a judge has something like 15 marshals armed standing around the different defendants, that the defendants are shackled during the trial. They are brought out a minute before we start. They are taken back for every lunch break. We had no time to talk with Mr. Mobley. I can tell you the court may have made observations about Mr. Mobley having words with counsel at that table. We are not in a private setting. We did not communicate about the case, and he was still unable to help us. Were we the nicest people in the courtroom that said hello to him? Obviously, we were, but we were not having conversations that were substantive about the case because he was unable to do that. Okay. The finding of malingering... Can I answer that? Quickly. Thank you. There was no finding of malingering by anybody other than Judge Thrash. He found that after Dr. Julie Rand specifically testified, she believed Mr. Mobley was not malingering. The government's expert said it needed to be ruled out, that he had some history with it. The question is, did this record give us enough for the district court to have found that notwithstanding the defendant's expert, that he was malingering? There was evidence in the prior records that doctors had suggested he might be malingering, but there had never been a previous finding of malingering. I mean, after seeing a lot of these kinds of records over the years, I mean, I don't ever... It's rare where they actually find that he was malingering. They always suspect that he might be. They always suspect. Yeah. I mean, when it comes up. And when we're dealing with the really important trial rights we have here, I don't think suspect should ever be enough. All right. I think we understand your argument, Ms. Dunn. Mr. Hollingsworth, you saved a minute. Please don't begin it with something I haven't heard before. I just want to recap real quick. 50,000 calls were listened to by Agent Buddy early of the FBI, and this was all in this eight-year investigation. Grice wasn't on one of those transcripted phone calls. Were there recordings at the record sites that we were discussing earlier where Grice is discussing his involvement in the Louisiana cocaine shipment? Those were not phone calls, Judge. I didn't say they were. I didn't say they were. The only positive evidence that they showed was the, I think it was two snippets, or it was a series of snippets that they put that Mr. Menard admitted he might have transcribed incorrectly if you look at the cross-examination of him. But from the conversation he had with Anthony McIntyre, which was filmed in a hotel room in Houston area by the FBI, neither agent did any investigation of Mr. Grice at all for the FBI. And that's on the record. Gilmour, Dontreau Gilmour, never affirmatively 100 percent said he's a member of the Gangster Disciples. If you look at the testimony, it was never said. And in fact, on cross-examination, he said he didn't know for sure. And I'm distilling that, but if you read that, you'll see that. Matthew Carman, the FBI analyst, never linked anything to my client. A telephone, not one iota of evidence. We'll look at the record sites, Mr. Hollingsworth. Thank you. Uh, we're going to move to the next.